**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**

**ADAM HATCH and MARLENA NEAGLE, individually and on behalf of all others similarly situated,**

***Plaintiffs*,**

**v.**

**AFLAC, INC.,**

***Defendant.***

Case No.: **4:25-cv-00208**

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs Adam Hatch and Marlena Neagle, ("Plaintiffs") bring this Class Action Complaint against Defendant Aflac Inc., ("Defendant") individually and on behalf of all others similarly situated, and allege, upon personal knowledge as to Plaintiffs' own actions and to counsels' investigation, and upon information and belief as to all other matters, as follows:

## PARTIES, JURISDICTION & VENUE

1. Plaintiff Adam Hatch is a resident citizen of Gretna, Sarpy County, Nebraska.

2. Plaintiff Marlena Neagle is a resident citizen of Farmington, San Juan County, New Mexico.

3. Defendant Aflac is a domestic corporation with a principal place of business located at 1932 Wynnton Road, Columbus, Georgia 31999.

4. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C.§1332, because this is a class action wherein the amount

in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there millions of members in the proposed class, and a significant portion of the class is a citizen of a state different from Defendant.

5. This Court has personal jurisdiction over Defendant because its principal place of business is in this District. Defendant has also purposefully availed itself of the laws, rights, and benefits of the State of Georgia.

6. Venue is proper under 28 U.S.C §1391 because Defendant maintains a principal place of business in this District and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in and emanated from this District.

## FACTUAL ALLEGATIONS

7. Plaintiffs bring this class action against Defendant for its failure to properly secure and safeguard the personally identifiable information and other sensitive information (hereafter, "PII") of its customers and employees including, but not limited to: names, claims information, health information, social security numbers, and other private information.

8. On or about June 20, 2025, Defendant began sending data breach notice emails to Plaintiffs and Class Members, informing them that an unauthorized party recently accessed its network and acquired personal information (the "Data Breach").

9. Omitted from the data breach notice email were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiffs, who retain a vested interest in ensuring that their PII remains protected.

10. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' PII was a known risk to Defendant, and thus, Defendant was on

notice that failing to take steps necessary to secure the PII from those risks left the data in a dangerous condition.

11. The Data Breach was a direct result of Defendant's failure to implement an information security program designed to: (a) to ensure the security and confidentiality of customer information; (b) to protect against anticipated threats or hazards to the security or integrity of that information; and (c) to protect against unauthorized access to that information that could result in substantial harm or inconvenience to any customer.

12. An information security program encompasses the administrative, technical, or physical safeguards used to access, collect, distribute, process, protect, store, use, transmit, dispose of, or otherwise handle customer information. Had Defendant implemented an information security program consistent with industry standards and best practices, it could have prevented the Data Breach.

13. As a result of the Data Breach, Plaintiffs have suffered an actual injury, similar to an intangible harm remedied at common law. Defendant's failure to implement an information security program resulted in the unauthorized disclosure of Plaintiffs' private information to cybercriminals. The unauthorized disclosure of Plaintiffs' PII constitutes an invasion of a legally protected privacy interest, that is traceable to the Defendant's failure to adequately secure the PII in its custody, and has resulted in actual, particularized, and concrete harm to the Plaintiffs. The injuries Plaintiffs suffered, as described herein, can be redressed by a favorable decision in this matter.

14. Armed with the PII acquired in the Data Breach, data thieves have already engaged in theft and can, in the future, commit a variety of crimes including, opening new financial accounts, taking out loans, using Plaintiffs' information to obtain government benefits, file

fraudulent tax returns, obtain driver's licenses, and give false information to police during an arrest.

15. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases." [1] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[2]

16. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiffs and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[3]

17. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[4] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[5]

---

[1] *See*, https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20and%20use,and%20other%20private%20information%20increases.
[2] *Id.*
[3] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf
[4] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/
[5] *See* https://www.investopedia.com/terms/s/ssn.asp

18. Note, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

19. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[6]

20. Plaintiffs bring this class action lawsuit individually, and on behalf of all those similarly situated, to address Defendant's inadequate data protection practices and for failing to encrypt sensitive data in storage and/or in transit.

***Data Breaches Are Avoidable***

21. Upon information and belief, the potential for improper disclosure of Plaintiffs' PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left the data in a dangerous condition.

22. In a document titled "INFORMATION RELATED TO THE RECENTLY DISCLOSED CYBER SECURITY INCIDENT" Defendant acknowledges that this Data Breach, "like many insurance companies are currently experiencing, was caused by a sophisticated cybercrime group. This was part of a cybercrime campaign against the insurance industry."

---

[6] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

INFORMATION RELATED TO THE RECENTLY DISCLOSED CYBER SECURITY INCIDENT

On June 12, 2025, Aflac Incorporated identified suspicious activity on our network in the United States. We promptly initiated our cyber incident response protocols and stopped the intrusion within hours. Importantly, our business remains operational, and our systems were not affected by ransomware. We continue to serve our customers as we respond to this incident and can underwrite policies, review claims, and otherwise service our customers as usual. This attack, like many insurance companies are currently experiencing, was caused by a sophisticated cybercrime group. This was part of a cybercrime campaign against the insurance industry.

We have engaged leading third-party cybersecurity experts to support our response to this incident. While the investigation remains in its early stages, in the spirit of transparency and care for our customers, we are sharing that our preliminary findings indicate that the unauthorized party used social engineering tactics to gain access to our network. The potentially impacted files contain claims information, health information, social security numbers, and/or other personal information, related to customers, beneficiaries, employees, agents, and other individuals in our U.S. business. We remain committed to caring for and supporting our customers. While our teams work to review the potentially impacted data and determine the specific information involved, we are offering **any individual who contacts our dedicated call center free credit monitoring and identity theft protection, and Medical Shield for 24 months.**

Please call our call center at 1-855-361-0305 which will open starting on June 20 at 8:00 a.m. Eastern Time. Our call center will be available Monday through Friday from 9:00 a.m. to 9:00 p.m. Eastern Time, Saturday from 9:00 a.m. to 5:30 p.m. Eastern Time and Sundays from 10:00 a.m. to 4:00 p.m. Eastern and excluding major U.S. holidays. **Starting July 1, the call center will be open from 9 a.m. to 9 p.m. ET Monday through Friday, and 9 a.m. to 5:30 p.m. ET on Saturdays.**

We regret that this incident occurred. We will be working to keep our stakeholders informed as we learn more and continue investigating the incident.

23. Upon information and belief, the Data Breach was carried out by a cybercriminal group known as Scattered Spider. The Scattered Spider group is known for using social engineering tactics—manipulating employees into granting access to internal systems—which allows them to bypass security measures without using malicious code. "According to Google's Threat Intelligence Group, Scattered Spider tends to focus on one industry at a time, launching coordinated attacks that exploit common vulnerabilities across similar organizations ."[7]

24. Upon information and belief, the Data Breach was a direct result of Defendant's failure to: (i) identify risks and potential effects of collecting, maintaining, and sharing personal

[7] *See*, https://theweektoday.com/affiliate-post/aflac-hit-major-cyberattack-amid-surge-insurance-sector-breaches/76388

information; (ii) adhere to its published privacy practices; and/or (iii) implement reasonable data protection measures for the collection, use, disclosure, and storage of personal information.

25. To prevent the Data Breach, Defendant could and should have implemented one or more of the following measures, as determined by the results of Defendant's privacy risk assessment:

<u>Reasonable Safeguards</u>

a. Create a "culture of security" by implementing a regular schedule of employee training. Update employees as you find out about new risks and vulnerabilities.

b. Tell employees about your company policies regarding keeping information secure and confidential. Post reminders in areas where sensitive information is used or stored, as well as where employees congregate.

c. Teach employees about the dangers of social engineering-based attacks and phishing attempts—emails containing information that makes the emails look legitimate. These emails may appear to come from someone within your company, generally someone in a position of authority. Make it office policy to independently verify any emails requesting sensitive information.

d. Regularly patch critical vulnerabilities in operating systems, software, and firmware on devices. Consider using a centralized patch management system.

e. Check expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities and implement policies for installing vendor-approved patches to correct problems.

f. Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks. Depending on your circumstances, appropriate assessments may range from having a knowledgeable employee run off-the-shelf security software to having an independent professional conduct a full-scale security audit.

g. Scan computers on your network to identify and profile the operating system and open network services. If you find services that you don't need, disable them to prevent hacks or other potential security problems.

h. Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

i. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email.

j. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

k. Configure firewalls to block access to known malicious IP addresses.

l. Set anti-virus and anti-malware programs to conduct regular scans automatically.

m. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

n. Configure access controls—including file, directory, and network share permissions— with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

o. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

p. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

q. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

r. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

s. Execute operating system environments or specific programs in a virtualized environment.

t. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

u. Conduct an annual penetration test and vulnerability assessment.

v. Secure your backups.[8]

w. Identify the computers or servers where sensitive personal information is stored.

x. Identify all connections to the computers where you store sensitive information. These may include the internet, electronic cash registers, computers at your branch offices, computers used by service providers to support your network, digital copiers, and wireless devices like smartphones, tablets, or inventory scanners.

y. Don't store sensitive consumer data on any computer with an internet connection unless it's essential for conducting your business.

z. Encrypt sensitive information that you send to third parties over public networks (like the internet) and encrypt sensitive information that is stored on your computer network, laptops, or portable storage devices used by your employees. Consider also encrypting email transmissions within your business.

aa. Regularly run up-to-date anti-malware programs on individual computers and on servers on your network.

---

[8] *How to Protect Your Networks from Ransomware*, at p.3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (accessed June 11, 2024).

bb. Restrict employees' ability to download unauthorized software. Software downloaded to devices that connect to your network (computers, smartphones, and tablets) could be used to distribute malware.

cc. To detect network breaches when they occur, consider using an intrusion detection system.

dd. Before you outsource any of your business functions investigate the company's data security practices and compare their standards to yours.[9]

26. Given that Defendant collected, used, and stored PII, Defendant could and should have identified the risks and potential effects of collecting, maintaining, and sharing personal information.

27. Without identifying the potential risks to the personal data in Defendant's possession, Defendant could not identify and implement the necessary measures to detect and prevent cyberattacks. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures, resulting in the Data Breach and the exposure of Plaintiffs' and the Class Members' PII.

28. Defendant knew and understood unencrypted PII is valuable and highly sought after by cybercriminals seeking to illegally monetize that data. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences that would occur if a data breach occurred, including the significant cost that would be imposed on Plaintiffs and the Class Members as a result.

***Plaintiffs and Class Members Sustained Damages in the Data Breach***

29. The invasion of Plaintiffs' and Class Members' privacy suffered in this Data Breach constitutes an actual, particularized, redressable injury traceable to the Defendant's conduct. As a

---

[9] *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (accessed June 11, 2024).

consequence of the Data Breach, Plaintiff and Class Members sustained monetary damages that exceed the sum or value of $5,000,000.00.

30. Additionally, Plaintiffs and Class Members face a substantial risk of future identity theft, fraud, or other exploitation where their names and social security numbers were targeted by a sophisticated hacker known for stealing and reselling sensitive data on the dark web. The substantial risk of future identity theft and fraud created by the Data Breach constitutes a redressable injury traceable to the Defendant's conduct.

31. Upon information and belief, a criminal can easily link data acquired in the Data Breach with information available from other sources to commit a variety of fraud related crimes. An example of criminals piecing together bits and pieces of data is the development of "Fullz" packages.[10] With "Fullz" packages, cyber-criminals can combine multiple sources of PII to apply for credit cards, loans, assume identities, or take over accounts.

32. Given the type of targeted attack in this case, the sophistication of the criminal claiming responsibility for the Data Breach, the type of PII involved in the Data Breach, the hacker's behavior in prior data breaches, the ability of criminals to link data acquired in the Data Breach with information available from other sources, and the fact that the stolen information has been placed, or will be placed, on the dark web, it is reasonable for Plaintiff and the Class Members to assume that their PII was obtained by, or released to, criminals intending to utilize the PII for future identity theft-related crimes or exploitation attempts.

---

[10] "Fullz" is term used by cybercriminals to describe "a package of all the personal and financial records that thieves would need to fraudulently open up new lines of credit in a person's name." A Fullz package typically includes the victim's name, address, credit card information, social security number, date of birth, bank name, routing number, bank account numbers and more. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm

33. The substantial risk of future identity theft, fraud, or other exploitation that Plaintiff and Class Members face is sufficiently concrete, particularized, and imminent that it necessitates the present expenditure of funds to mitigate the risk. Consequently, Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to understand and mitigate the effects of the Data Breach.

34. For example, the Federal Trade Commission has recommended steps that data breach victims take to protect themselves and their children after a data breach, including: (i) contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity); (ii) regularly obtaining and reviewing their credit reports; (iii) removing fraudulent charges from their accounts; (iv) closing new accounts opened in their name; (v) placing a credit freeze on their credit; (vi) replacing government-issued identification; (vii) reporting misused Social Security numbers; (viii) contacting utilities to ensure no one obtained cable, electric, water, or other similar services in their name; and (ix) correcting their credit reports.[11]

35. As a consequence of the Data Breach, Plaintiffs and Class Members sustained or will incur monetary damages to mitigate the effects of an imminent risk of future injury. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year. The cost of dark web scanning and monitoring services can cost around $180 per year.

36. As a result of the Data Breach, Plaintiffs' and Class Members' PII, which has an inherent market value in both legitimate and illegitimate markets, has been damaged and diminished by its unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss.

---

[11] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

37. Personal information is of great value, in 2019, the data brokering industry was worth roughly $200 billion.[12] Data such as name, address, phone number, and credit history has been sold at prices ranging from $40 to $200 per record.[13] Sensitive PII can sell for as much as $363 per record.[14]

38. Furthermore, Defendant's poor data security practices deprived Plaintiffs and Class Members of the benefit of their bargain. By transacting business with Plaintiffs and Class Members, collecting their PII, using their PII for profit or to improve the ability to make profits, and then permitting the unauthorized disclosure of the PII, Plaintiffs and Class Members were deprived of the benefit of their bargain.

39. When agreeing to pay Defendant for products or services, consumers understood and expected that they were, in part, paying for the protection of their personal data, when in fact, Defendant did not invest the funds into implementing reasonable data security practices. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

40. As a result of the Data Breach, Plaintiffs and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft and misuse of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate

---

[12] *Column: Shadowy data brokers make the most of their invisibility cloak*, https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[13] *In the Dark*, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

[14] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; (viii) substantially certain, imminent and impending injury in the form of fraud or identity theft; (ix) out-of-pocket expenses; and (x) the continued and increased risk their PII will be further misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access on the dark web or otherwise; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the data.

## CLASS ALLEGATIONS

41. Plaintiffs bring this nationwide class action individually, and on behalf of all similarly situated individuals, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

42. The Class that Plaintiffs seeks to represent is defined as follows:

> **Nationwide Class**: All individuals residing in the United States whose PII was accessed and acquired by an unauthorized party as a result of the Data Breach, as reported by Defendant (the "Class").

43. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

44. Plaintiffs reserve the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

45. Numerosity: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. While the exact number of Class Members is unknown to Plaintiffs at this time and such number is exclusively in the possession of Defendant, upon information and belief, at least 100,000 individuals were impacted by the Data Breach.

46. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. The questions of law and fact common to the Class that predominate over questions which may affect individual Class Members, includes the following:

a. Whether and to what extent Defendant had a duty to protect the PII of Plaintiffs and Class Members;
b. Whether Defendant had a duty not to disclose the PII of Plaintiffs and Class Members to unauthorized third parties;
c. Whether Defendant failed to adequately safeguard the PII of Plaintiffs and Class Members;
d. Whether Defendant required its third-party vendors to adequately safeguard the PII of Plaintiffs and Class Members;
e. When Defendant actually learned of the Data Breach;
f. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;
g. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their PII had been compromised;
h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;
i. Whether Defendant adequately addressed and fixed the practices, procedures, or vulnerabilities which permitted the Data Breach to occur;
j. Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;
k. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm faced as a result of the Data Breach.

47. Typicality: Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

48. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

49. Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

50. Superiority and Manageability: The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually

afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

51. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since Defendant would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

52. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

53. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

54. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

55. Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

56. Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, sharing, storing, and safeguarding their PII;
b. Whether Defendant's security measures to protect its network were reasonable in light of industry best practices;
c. Whether Defendant's (or their vendors') failure to institute adequate data protection measures amounted to negligence;
d. Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII;
e. Whether Defendant made false representations about their data privacy practices and commitment to the security and confidentiality of customer information; and
f. Whether adherence to industry standards and best practices for protecting personal information would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT 1: NEGLIGENCE/WANTONNESS

57. Plaintiffs re-allege and incorporate by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

58. Defendant obtains sensitive PII from its applicants and employees, including Plaintiffs and Class Members, in the ordinary course of business.

59. Plaintiffs and Class Members were required to entrust Defendant with their PII with the understanding that Defendant would adequately safeguard their information.

60. Defendant had full knowledge of the types of PII it collected and the types of harm that Plaintiffs and Class Members would suffer if that data was accessed and exfiltrated by an unauthorized third-party.

61. By collecting, storing, sharing, and using the Plaintiffs' and Class Members' PII, Defendant assumed a duty to use reasonable means to safeguard the personal data it obtained. Defendant's duty included a responsibility to ensure it: (i) implemented reasonable administrative, technical, and physical measures to detect and prevent unauthorized intrusions into its information technology environment; (ii) contractually obligated its vendors to adhere to the requirements of Defendant's privacy policy; (iii) complied with applicable statutes and data protection obligations; (iv) conducted regular privacy assessments and security audits of Defendant's and/or its vendors' data processing activities; (v) regularly audited for compliance with contractual and other applicable data protection obligations; and, (vi) provided timely notice to individuals impacted by a data breach event.

62. Defendant breached its duty by failing to implement an information security plan or use reasonable security measures to protect PII. Defendant's breach constitutes negligence and/or wantonness.

63. Defendant's failure to adhere to its data privacy and security obligations was a reckless disregard for the Plaintiffs and Class Members' privacy rights. Defendant knew, or should have known, that its failure to take reasonable precautions might result in injury to Plaintiffs and Class Members. The negligent and wanton acts or omissions committed by Defendant includes, but is not limited to, the following:

a. Failing to designate a qualified individual to implement and supervise its information security program.

b. Failing to conduct an assessment to determine foreseeable risks and threats – internal and external – to the security, confidentiality, and integrity of customer information.

c. Failing to design and implement safeguards to control the risks identified through the risk assessment.

d. Failing to encrypt personally identifying information in transit and at rest.

e. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII.

f. Failing to adequately monitor the security of their networks and systems.

g. Allowing unauthorized access to PII.

h. Failing to detect in a timely manner that PII had been compromised.

i. Failing to remove former customers' PII it was no longer required to retain.

64. The injuries resulting to Plaintiffs and the Class because of Defendant's failure to use adequate security measures was reasonably foreseeable.

65. Plaintiffs and the Class were the foreseeable victims of a data breach. Defendant knew or should have known of the inherent risks in collecting and storing PII, the critical importance of protecting that PII, and the necessity of training its employees on data protection best practices.

66. Plaintiffs and the Class had no ability to protect the PII in Defendant's possession. Defendant was in the best position to protect against the harms suffered by Plaintiffs and the Class as a result of the Data Breach.

67. But for Defendant's breach of duties owed to Plaintiffs and the Class, their PII would not have been compromised. There is a close causal connection between Defendant's failure to implement reasonable security measures to protect the PII of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class.

68. As a result of the Data Breach, Plaintiffs and Class Members suffered injuries. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

69. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data protection procedures; and (ii) to provide adequate monitoring and protection to all affected by the Data Breach.

**COUNT 2: BREACH OF IMPLIED CONTRACT**

70. Plaintiffs re-allege and incorporate by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

71. Defendant obtains sensitive PII from their customers and employees, including Plaintiffs and Class Members, in the ordinary course of providing services.

72. In so doing, Plaintiffs and Class Members entered implied contracts with Defendant by which Defendant agreed to use reasonable technical, administrative, and physical safeguards to protect against unauthorized access to, use of, or disclosure of the personal information it collects and stores.

73. Plaintiffs and Class Members would not have entrusted their PII to Defendant in the absence of an expressed or implied promise to implement reasonable data protection measures.

74. Plaintiffs and Class Members fully and adequately performed their obligations under the implied contract with Defendant.

75. Defendant breached the implied contract with Plaintiffs and Class Members which arose from the course of conduct between the parties, as well as disclosures on the Defendant's web site, privacy notice, and in other documents, all of which created a reasonable expectation that the personal information Defendant collected would be adequately protected and that the Defendant would take such actions as were necessary to prevent unauthorized access to, use of, or disclosure of such information.

76. As a direct and proximate result of the Defendant's breach of an implied contract, Plaintiffs and Class Members suffered damages in an amount to be decided by a jury.

77. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate monitoring/protection to all affected by the Data Breach.

**COUNT 3: UNJUST ENRICHMENT**

78. Plaintiffs re-allege and incorporate by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

79. Plaintiffs bring this Count in the alternative to the breach of implied contract count above.

80. By obtaining their PII, Plaintiffs and Class Members conferred a monetary benefit on Defendant. Defendant knew that Plaintiffs and Class Members conferred a benefit upon it and has accepted and retained that benefit.

81. By collecting the PII, Defendant was obligated to safeguard and protect such information, to keep such information confidential, and to timely and accurately notify Plaintiffs and Class Members if their data had been compromised or stolen.

82. Defendant failed to secure Plaintiffs and Class Members' PII and, therefore, it would be unjust for Defendant to retain any of the benefits that Plaintiffs and Class Members conferred upon Defendant without paying value in return.

83. Plaintiffs and Class Members are entitled to restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

## COUNT 4: BREACH OF CONFIDENCE

84. Plaintiffs re-allege and incorporate by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

85. Plaintiffs and Class Members had a legitimate expectation of privacy in their sensitive information such as social security numbers. Plaintiffs and Class Members were entitled to the protection of this information from disclosure to unauthorized third parties.

86. Defendant had a fiduciary duty to Plaintiffs and Class Members as a result of their relationship whereby Defendant became the custodian of Plaintiffs and Class Members' PII.

87. Plaintiffs and Class Members reposed trust and confidence in Defendant to adequately safeguard the PII collected or created during that relationship.

88. Defendant breached duties owed to Plaintiffs and Class Members by failing to effectively train all members of its workforce on the policies and procedures with respect to PII as necessary and appropriate for the members of its workforce to carry out their functions and to maintain the confidentiality of the PII.

89. Defendant permitted its information technology environment to remain vulnerable to foreseeable threats, which created an atmosphere for the Data Breach to occur. Despite knowledge of the substantial risk of harm created by these conditions, Defendant intentionally disregarded the risk, thus permitting the Data Breach to occur.

90. By failing to properly safeguard confidential data, Defendant permitted the public disclosure of Plaintiffs and Class Members' PII to unauthorized third parties in the Data Breach.

91. As a result of Defendant's failure to prevent and avoid the Data Breach from occurring, Plaintiffs and Class Members' PII was disclosed and misappropriated to unauthorized

parties beyond Plaintiffs and Class Members' confidence, and without their prior affirmative consent.

92. As a direct and proximate cause of Defendant's actions and omissions, Plaintiffs and Class Members have suffered damages.

93. The damage Plaintiffs and the Class suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiffs and Class Members' PII. Defendant knew or should have known its methods of accepting and securing Plaintiffs and Class Members' Private Information was inadequate as it relates to, at the very least, securing servers and other equipment containing Plaintiffs and Class Members' Private Information.

94. As a direct and proximate result of Defendant's breach of confidence, Plaintiffs and Class Members have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the other members of the Class alleged herein, respectfully requests that the Court enter judgment as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives for the Class and counsel for Plaintiffs as Class Counsel;

B. For an order declaring the Defendant's conduct violates the statues and causes of action referenced herein;

C. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

D. Ordering Defendant to pay for at least 5 years of credit monitoring and dark web scanning services for Plaintiffs and the Class;

E. For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

F. For prejudgment interest on all amounts awarded;

G. For an order of restitution and all other forms of equitable monetary relief requiring the disgorgement of the revenues wrongfully retained as a result of the Defendant's conduct;

H. For injunctive relief as pleaded or as the Court may deem proper; and

I. For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit, and any other expense, including expert witness fees; and

J. Such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint and of all issues in this action so triable as of right.

Dated: July 1, 2025.

Respectfully Submitted,

*/s/ Andre Belanger*

Andre Belanger, Esq. (Bar ID No.: 216527)
Paul J. Doolittle, Esq.*
**POULIN | WILLEY |**
**ANASTOPOULO, LLC**
32 Ann Street
Charleston, SC 29403
Telephone: (803) 222-2222
Fax: (843) 494-5536
Email: paul.doolittle@poulinwilley.com
andre.belanger@poulinwilley.com
cmad@poulinwilley.com

*Pro Hac Vice forthcoming

*Attorneys for Plaintiff & Proposed Class*